ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
DARREN J. ROBBINS (168593)
DANIELLE S. MYERS (259916)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA MATHESON, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| INTEL CORPORATION, ROBERT H. SWAN and GEORGE S. DAVIS, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Linda Matheson ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Intel Corporation ("Intel" or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**BACKGROUND AND OVERVIEW**

1.      This is a securities fraud class action on behalf of all purchasers of Intel publicly traded securities between April 23, 2020 and July 23, 2020, inclusive (the "Class Period").  This action is brought against Intel, its Chief Executive Officer ("CEO") Robert H. Swan ("Swan"), and its Chief Financial Officer ("CFO") George S. Davis ("Davis") for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5, promulgated thereunder.

2.      Intel designs and manufactures hardware and software for computing, networking, data storage, and communications solutions.  The Company's operating segments include the Data Center Group, Internet of Things Group, Non-Volatile Memory Solutions Group, Programmable Solutions Group, Client Computing Group, and All Other segments.

3.      The Company describes its leadership and business values as being based upon six pillars of technology and innovation defined by its ability to optimize process technology, architecture, memory, interconnect, security, and software:

- Process:   Next-generation manufacturing processes progressively increasing performance.

- Memory:  Developing products to disrupt the memory and storage hierarchy.

- Security:  Creation of the Intel Security Architecture and Technologies Group to serve as a center for security architecture across products.

- Software:  Unifying software abstractions across all of its xPU platforms.

- Architecture:  Designing products for four major computing architectures – CPU, GPU, AI accelerator, and FPGA.

- Interconnect:  Interconnect solutions, ranging from silicon to the data center to wireless designed to create high-speed optical connections.

4.      The Company's most critical pillar is its process pillar, which is focused on the design and manufacture of its Intel Core processors.  The current iteration of Intel's processor is its 10-nanometer portfolio of products, which is based on the Company's 10th generation Intel Core processor.[1]  According to the Company, these 10nm processors feature a new core architecture and are expected to deliver increased graphics performance, AI, and new levels of integrated connectivity for thin, light laptops and mobile devices.  While the Company reported success in finally shipping its 10nm products in 2019, for years Intel's development of 10nm processors suffered from embarrassing manufacturing and production delays that resulted in damage to its reputation and the loss of market share to competitors like Advanced Micro Devices ("AMD") and Nvidia.

5.      In an effort to rebuild its reputation and competitive position, in 2018 the Company hired Jim Keller ("Keller") as Senior Vice President to lead the Company's Silicon Engineering Group, which encompasses system-on-chip development and integration.  Keller is renowned in the tech community – previously helping AMD to develop its K7 Athlon processor and helping Tesla to develop its autonomous driving technology.  In a press release announcing the hiring of Keller, Dr. Murthy Renduchintala ("Renduchintala"), Intel's Chief Engineering Officer and Group President of the Technology, Systems Architecture & Client Group ("TSCG"), described Keller as "'one of the most respected microarchitecture design visionaries in the industry.'"

6.      Accordingly, by 2020, in order to catch up and regain its market position, it was imperative that Intel effectively produce and ship its 10nm processors while simultaneously developing its 7nm processors – the Company's next generation processing technology scheduled

---

[1]    10 nanometer or "10nm" is the size of the semiconductor manufacturing process, as is "7nm" or "5nm."

for release in 2021.  The Company's January 24, 2020 Form 10-K filed with the SEC stated follows:

> Our 10nm manufacturing process entered full production as we launched our first products from this advanced technology.  We are accelerating the pace of process node introductions and moving back to a 2- to 2.5-year cadence.  We are on track to deliver our first 7nm-based product, a discrete GPU, at the end of 2021
>
> *          *          *
>
> We are on track to deliver our first 7nm-based product, a data center-focused discrete GPU, at the end of 2021.  We are approaching next-generation process nodes with a focus on striking an optimal balance between schedule, performance, power, and cost and will continue to drive intra-node advancement.

7.      During the Class Period, which began on April 23, 2020, Intel, Swan and Davis misrepresented the Company's business and financial condition by issuing false and misleading statements regarding the Company's financial performance, and particularly the current performance and production status of its 10nm products and new generation 7nm products. Specifically, the Company falsely assured investors that: (i) it was accelerating production of 10nm products because of unexpectedly strong demand; (ii) there was nothing unusual about its declining gross margin performance other than stronger 10nm demand; and (iii) the Company remained "on track" with plans it had previously laid out with respect to its 7nm product and its scheduled delivery in 2021.  For example:

- *"[W]e'll be ramping 10-nanometer even more while we're investing in 7-nanometer that we anticipate having in the fourth quarter of 2021. . . . [W]e're well on track from the plans we laid out*."[2]

Market analysts repeated defendants' misrepresentations concerning 10nm and 7nm development:

- "*[T]he investment case remains [Intel]'s progress in catching up to TSMC (and, ergo, AMD) on manufacturing and . . . 7nm remains totally on track*."

- "*Looking forward to 7nm, [Intel]'s time-line remains unchanged with a late 2021 launch . . . .*"

8.      On June 5, 2020, Intel's stock price reached a Class Period high of $64.34 per share.

---

[2]    Emphasis has been added unless otherwise noted.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 3 -

9.      Defendants' representations about Intel's gross margin performance and prospects and the timing and delivery of its 7nm processor and its relation to demand for 10nm products were each false and misleading in that they omitted the true facts, including that:

(a)      Intel's 7nm processor scheduled for release in 2021 was not on track, but rather, was suffering from material production and yield defects that threatened the 2021 delivery and timing of the product and the Company's overall product roadmap;

(b)      the Company's gross margins and fiscal 2020 outlook had been adversely impacted and would continue to be adversely impacted by continued acceleration of 10nm production and simultaneous 7nm technology development problems;

(c)      Senior Vice President Keller (who had been hired in 2018 to take over and lead Intel's stumbling process and chip development group) was pressing to utilize third-party foundries in order to be more competitive in 10nm and 7nm production and planned to quit (or the Company was planning to terminate him) in the middle of the development cycle;

(d)      because of the ongoing process and production defects of the 7nm products, the Company was considering material changes to its manufacturing protocols to include third-party foundries – a process that Intel had long resisted; and

(e)      as a result of (a)-(d) above, defendants' positive statements about Intel's business condition and prospects were materially false and misleading.

10.      On June 11, 2020, the Company announced the abrupt resignation of Keller, effective immediately, though he would stay as a consultant until December 2019.  *See* ¶34, *infra*.

11.      On the same day, June 11, 2020, defendants Davis and Swan met with Deutsche Bank analysts to reassure the market that 7nm development remained on track to debut in 2021. *See* ¶36, *infra*.

12.      Then on July 23, 2020, after the market closed, Intel issued a release announcing its second quarter 2020 financial results.  Despite impressive revenue and earnings results, the Company shocked investors by disclosing that it was further accelerating its transition to 10nm products and, more importantly, that production and development of its 7nm chips was 12 months behind schedule.  Specifically, the release stated:

*The company's 7nm-based CPU product timing is shifting approximately six months relative to prior expectations. The primary driver is the yield of Intel's 7nm process, which based on recent data, is now trending approximately twelve months behind the company's internal target.*

13.     During the conference call conducted by Intel following the issuance of its earnings release, one analyst challenged the veracity of the Company's overall story regarding the acceleration of its 10nm chips because of the impact on margins:

[Analyst:]  I want to ask about the acceleration in 10-nanometer.  Is this really because yields are getting better and there's higher demand or because you're trying to offset the 7-nanometer delay?  Because it's hitting the margins big time . . . .

14.     On July 24, 2020, Credit Suisse issued a report, titled "BitbyBit: Intel Q2 read: 7nm delays and lower capex," which remarked on the significance of the disclosure:

While Intel reported better sales than expected (Q2: $19.7bn vs. cons at $18.5bn and Q3 guide: $18.2bn vs. cons at $17.9bn), *GMs were lower (Q2: 54.8% vs. cons at 55.9% and Q3 guide: 57% vs. cons at 58%)* and *headlines were grabbed by the announcement that 7nm chip launches will be delayed by 6 months as the company is running 12 months behind its internal target due to manufacturing defect leading to yield issues*.

\*      \*      \*

*[I]t remains unclear whether 7nm will be back on track after this initial delay or may lead to further roadblocks.  Further, Intel also lowered its capex guidance to $15bn (-7% yoy) for 2020 due to plans for a bit higher spend on 10nm and lower spend on 7nm* . . . .

15.     As a result of these disclosures, the Company's share price declined approximately 16%, from a close of $60.40 per share on July 23, 2020 to a close of $50.59 per share on July 24, 2020, on more than 182 million shares traded.

16.     On July 27, 2020, the Company announced the departure of Renduchintala, its Chief Engineering Officer, and Intel's stock price declined from a close of $50.59 per share on July 24, 2020 to a close of $49.57 per share on July 27, 2020, on 107 million shares traded.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

21.     Plaintiff Linda Matheson purchased Intel securities during the Class Period, as described in the certification attached hereto and incorporated herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

22.     Defendant Intel Corporation is a Delaware corporation with its principal executive offices located in Santa Clara, California.  Intel's common stock trades on the NASDAQ exchange under the symbol "INTC."

23.     Defendant Robert H. Swan ("Swan") is and was at all relevant times the CEO of the Company.

24.     Defendant George S. Davis ("Davis") is and was at all relevant times the CFO of the Company.

25.     Defendants Swan and Davis (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations that were being made were then materially false and/or misleading.  The Individual

Defendants are liable for the false statements pleaded herein.

<b>SUBSTANTIVE ALLEGATIONS</b>

26.     On April 23, 2020, the Company issued a release announcing its first quarter 2020

financial results, including revenues, earnings and gross margins, among other things.  The release

stated, in relevant part:

- First-quarter revenue was $19.8 billion, up 23% year-over-year (YoY). Data-centric revenue grew 34 percent and PC-centric revenue grew 14 percent YoY.

- First-quarter GAAP earnings-per-share (EPS) was $1.31, up 51 percent YoY; non-GAAP EPS of $1.45 was up 63 percent.

- Generated $6.2 billion cash from operations and $2.9 billion of free cash flow while strengthening liquidity with $10.3 billion in new debt and suspension of share buybacks.

- Expecting second-quarter revenue of $18.5 billion; GAAP EPS of $1.04 and non-GAAP EPS of $1.10; not providing full-year guidance given significant economic uncertainty.

(Footnote omitted.)

27.     Following the dissemination of the April 23, 2020 press release, the Company

conducted a conference call for analysts and investors hosted by defendants Swan and Davis.

During the call, defendants discussed Intel's first quarter results, including the overall status of the

development of its 10nm processor and its investment in the 7nm technology – indicating that both

were on track with the Company's previously reported plans.  The Company also discussed the

gross margin impact of accelerated 10nm production:

> [Analyst:]  I'd be interested on magnitude of Tiger Lake[3] versus just lower volumes and then other 10-nanometer parts.  And I guess, more importantly, how do we think about kind of normalized sort of gross margins as you get past some of the start-up costs for a faster 10-nanometer ramp?
>
>     . . . [Davis:]  I think the way we would look at it is pretty much we're not seeing anything as – *if you take COVID out of the year, we're really not seeing anything different in our basic view of gross margin dynamics, with the exception of we're seeing stronger pull-in of demand for some of our 10-nanometer*

---

[3]   "Tiger Lake" is the named used to describe Intel's portfolio of 10nm core processors.

*products*.  I mean I think one of the things – we got very strong demand for Tiger Lake.

\*        \*        \*

[Swan:]  On the second part of your question, I'd go back to the commentary that George provided back at our Analyst Day in the spring, which is, obviously, when we transition from a mature node to a new node, margins tend to come down. We indicated that we plan to get back on a 2- to 2.5-year cadence, *which means in 2021, we'll be ramping 10-nanometer even more while we're investing in 7-nanometer that we anticipate having in the fourth quarter of 2021. . . . [B]ut we feel like it's – we're well on track from the plans we laid out* and feel pretty good about a dynamite first quarter and an outlook for the second quarter in line or better than what we expected.

28.     On the same day, April 23, 2020, Cowen issued a report, titled "Many Questions on Demand, Margins; Some Obviously Expected, Some New," concerning the Company's financial results, discussing the fact that the Company had exceeded first quarter earnings estimates, as expected, but questioning the reported gross margin fluctuations amid the ramp up of 10nm products, stating:

[I]n addition to obvious questions on demand sustainability, *the 2Q GM decline of 600 bps* Q/Q was explained, but not sufficiently. . . .

**What Happened?**

Intel printed a significant beat as expected, but guidance fell short of lofty forecasts, particularly *GM, which is expected down >600bps Q/Q, partially (~300bps) due to accounting treatment of pre-qualified 10nm Tiger Lake* notebook chips that should reverse in 3Q.  Half the decline, however, was due to lower revenue and lower 10nm margins. . . .

. . . *Further, we were left with more questions than answers after management guided 2Q GM down significantly Q/Q*.  We had expected GM to decline materially by the end of 2020 as 10nm NB ramped and 10nm Ice Lake server volumes started, but we were surprised to see such severe impacts from Tiger Lake reserves, and to a lesser extent Snow Ridge, called out as culprits for the 2Q decline.  Management explained ~50% of the 600bps decline is from expected pre-qualification reserves in 2Q ahead of 2H20 Tiger Lake shipments.  Intel believes this is largely a timing issue ahead of OEM qualifications, with management estimating *it can still* potentially *hit its prior 59.0%* GM target for FY2020.  PC launches are understandably in flux with E3 canceled and Computex delayed, *but we are surprised by such a large margin headwind* from notebooks while our checks indicate demand and lead times remain extended.  To be fair, management expects this trend to reverse when the products ship in 3Q, *but this still leaves 300bps of GM pressure even before 10nm large-die server shipments begin in late 2020 and initial 7nm startup costs (and potentially a 10nm DT roadmap) hit thereafter*.

**Reiterating Our Unchanged Long-Term Thesis**

> *. . . **We see strengthening and more diverse competition on leading 7nm/5nm manufacturing nodes enabled by TSMC, and mounting margin pressure as Intel looks to get its node progression back on track**.*

29.     On April 24, 2020, Barclays issued a report titled "GM Miss from 10nm Pull-in Steals Upside." The report discussed the gross margin disclosures in the April 23, 2020 financial report despite the strong earnings per share results. The Barclays report noted that Intel's reported gross margin miss was explained by the Company as simply 10nm Tiger Lake write-offs and 10nm process acceleration, but expressed worry that 10nm yields might still be challenging while the Company was investing in the development of 7nm:

**GM Miss from 10nm Pull-in Steals Upside**

> March results are robust but June is not as strong as expected given Data Center is roughly flat (vs. expectations for growth) and the company missed GMs by 300 bps. The biggest issue with the guidance is the lower GM, which the company indicated was a result of write-offs associated with 10nm client Tiger Lake, 10nm acceleration, and lower volumes. ***The bulls will point to the fact that the company is finally indicating 10nm is coming in faster than expected***, and the skeptics will say the lower GM is indicative of poor 10nm yields. ***We are still in the camp 10nm is not fully fixed and see challenges in improving these yields while also investing in 7nm***, but recognize the pull-in is a positive. Overall, this report is a disappointment vs. high Data Center expectations, ***but we are intrigued if the 10nm problem is finally improving***.

>                          *        *        *

> ***GM guide of 56% (vs. St. 59.1%) remains the point of concern for June as [Intel] noted pre-qualification reserves of 10nm Tiger Lake products, accelerated ramp of 10nm***, and lower volumes.

30.     On April 24, 2020, UBS issued a report largely echoing Intel's sentiment on the April 23, 2020 call and suggesting to investors that reduced gross margins were ***not*** a real concern, but rather, merely a timing issue, and that both the development of 10nm technology and the 7nm manufacturing were "totally on track":

**CQ2 Gross Margin Guidance Belies A Narrative That Is Fully On Track, If Not Better; Maintain Buy**

**Gross margin is just timing, while more important fulcrum points were solid**

> Revenue beat by ~6% and was guided ~4% above – by itself, solid results even against elevated expectations. . . . ***We understand investor concerns around the poor CQ2 gross margin guidance as this is a touch point given an increasingly competitive environment, but this is simply the result of an acceleration in its***

1    ***10nm product cadence*** and [Intel] actually leaned in to suggest that the full-year
2    impact of the acceleration would be minimal. ***In other words, gross margin should
     snap back in 2H. Bigger picture, the main fulcrum on the investment case
3    remains [Intel]'s progress in catching up to TSMC*** (and, ergo, AMD) on
     manufacturing and we would argue that the read through was, if anything, better as
4    10nm costs are clearly coming down (though always limited) ***and 7nm remains
     totally on track***. Bottom line, ***we remain bullish here as the margin story is
5    unchanged and the manufacturing narrative is about to gain significant
     momentum***.

6        31.    On April 24, 2020, Intel filed a Form 10-Q with the SEC for the period ended March

7    28, 2020.  The Form 10-Q repeated Intel's April 23, 2020 first quarter financial results and referred

8    investors to the risk factors listed in the January 24, 2020 annual report, including the

9    acknowledgment that the Company's key competitors engage third-party manufacturers,

10   specifically Taiwan Semiconductor Manufacturing Co. ("TSMC"), and purporting to warn that, if

11   Intel does not timely introduce new process technologies with sufficient manufacturing yields,

12   such competition might put Intel at a competitive disadvantage and the Company's financial results

13   "could" be adversely affected:

14            ***We face significant competition***. . . .

15            Our products primarily compete based on performance, energy efficiency,
        integration, ease-of-use, innovative design, features, price, quality, reliability,
16      security, software ecosystem and developer support, ***time-to-market, reliable
        product roadmap execution***, brand recognition, customer support and
17      customization, and availability. . . .

18            . . . ***Most of our competitors rely on third-party foundries, such as Taiwan
        Semiconductor Manufacturing Company, Ltd.*** or Samsung Electronics Co., Ltd.,
19      and subcontractors for manufacture and assembly and test of their semiconductor
        components and products.  As an IDM, we have higher capital expenditures and
20      R&D spending than many of our "fabless" competitors.

21                              *     *     *

22            To compete successfully, we must maintain a successful R&D effort,
        develop new products and production processes, and improve our existing products
23      and processes, all ahead of competitors. . . .  ***[T]o the extent we do not timely
        introduce new manufacturing process technologies that improve transistor
24      density with sufficient manufacturing yields and operational efficiency, relative
        to competing foundry processes, we can face cost and product performance
25      disadvantages***.

26                              *     *     *

27            ***In addition, to the extent we face delays in the timing of our product
        introductions, we could become less competitive and lose revenue opportunities,
28      and our gross margin could be adversely affected*** because we incur significant

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 10 -

costs up front in the product development stage and earn revenue to offset these costs over time.

32.     Following the announcement of Intel's first quarter 2020 results and product upgrade, the Company's stock traded above $58.00 per share.

33.     Each of the above statements was materially false and misleading, as defendants knew or deliberately disregarded, and failed to disclose the following:

(a)     Intel's 7nm processor scheduled for release in 2021 was not on track, but rather, was suffering from material production and yield defects that threatened the 2021 delivery and timing of the product and the Company's overall product roadmap;

(b)     the Company's gross margins and fiscal 2020 outlook had been adversely impacted and would continue to be adversely impacted by continued acceleration of 10nm production and simultaneous 7nm technology development problem;

(c)     Senior Vice President Keller (who had been hired in 2018 to take over and lead Intel's stumbling process and chip development group) was pressing to utilize third-party foundries in order to be more competitive in 10nm and 7nm production and planned to quit (or the Company was planning to terminate him) in the middle of the production cycle;

(d)     because of the ongoing process and production defects in the 7nm products, the Company was considering material changes to its manufacturing protocols to include third-party foundries – a process that Intel had long resisted; and

(e)     as a result of (a)-(d) above, defendants' positive statements about Intel's business condition and prospects were materially false and misleading.

34.     On June 11, 2020, the Company announced the abrupt departure of Senior Vice President Keller.  As discussed above, Keller had a reputation as a chip designer superstar who was hired by Intel in 2018 to help correct missteps in the Company's development of its 10nm products:

***Changes in Intel's Technology, Systems Architecture and Client Group (Update)***

***Jim Keller to Depart Intel; New Leaders Named***

. . . ***Today, Intel announced that Jim Keller has resigned effective June 11, 2020,*** due to personal reasons. Intel appreciates Mr. Keller's work over the past

two years helping them continue advancing Intel's product leadership and they wish him and his family all the best for the future.  Intel is pleased to announce, however, that Mr. Keller has agreed to serve as a consultant for six months to assist with the transition.

35.     The release assured investors that Renduchintala, however, remained on staff as the leader of a "vastly experienced" team of engineers:

Intel has a vastly experienced team of technical leaders within its Technology, Systems Architecture and Client Group (TSCG) under the leadership of Dr. Venkata (Murthy) Renduchintala, group president of TSCG and chief engineering officer.

36.     On June 11, 2020, the same day Keller's resignation was announced, defendants Swan and Davis met with Deutsche Bank to reassure investors of the status of the Company's 10nm and 7nm transition.  Deutsche Bank analysts published a report, titled "Takeaways from virtual NDR with CEO and CFO," stating that the Company's delivery schedule for 7nm remained unchanged:

**Takeaways from virtual NDR with CEO and CFO**

We hosted [Intel] CEO Bob Swan, CFO George Davis, and the Intel IR team in an NDR on Thursday 6/11.  ***Our key takeaways include: 1) Discussions around [Intel]'s manufacturing, specifically their 10nm/7nm node transition details*** . . . .

\*          \*          \*

***Intel reiterated confidence in ramping 10nm at a slightly accelerated pace vs. expectations entering 2020***.  In terms of 10nm ramps milestones for investors to monitor, [Intel] is now running 10nm at three fabs and launching a number of new 10nm/10nm+ products over the next year.  Specifically, [Intel] is ramping Tiger Lake NB CPUs in mid-2020 on 10nm+, Snow Ridge 5G basestation SoCs and Agilex FPGAs in 2H20, Ice Lake server CPUs in late 2020 (10nm) and Sapphire Rapids in 2021 (10nm+).  ***Looking forward to 7nm, [Intel]'s time-line remains unchanged with a late 2021 launch*** targeted (Datacenter GPU initially) and 2022 volume ramps in CPUs (both server/PCs).  The company's goals remain ramping 10nm, achiev[ing] competitive parity at 7nm, and regain[ing] Moore's Law leadership at 5nm.

37.     Following the June 11, 2020 disclosure of Keller's departure and defendants' virtual meeting with Deutsche Bank, Intel's stock price declined from a close of $63.87 per share on June 10, 2020 to a close of $59.70 per share on June 11, 2020, but continued to trade at artificially inflated prices above $59.00 per share.

1    38.    On June 20, 2020, *The New York Times* published an article titled "After 15 Years,

2   Apple Prepares to Break up with Intel."   The article, on the heels of the Keller resignation,

3   explained that, while Apple had partnered with Intel and its silicon chips since 2005 to power its

4   Macs, the time had come for Apple to build its own chips.   The article discussed, among other

5   things, Intel's prior manufacturing and production delays and its inability to technologically

6   advance at Apple's pace.   In addition, the article noted that Taiwanese manufacturer TSMC, which

7   was being used by Intel competitors like AMD, had been contracted to build Apple's new chips:

8      ***After 15 Years, Apple Prepares to Break Up With Intel***

9        Apple could announce plans as soon as Monday to replace Intel processors
10    in Macs with chips that it designed itself.

                                    *      *      *

11

12        Taiwan Semiconductor Manufacturing, the partner Apple uses to build
    similar components it designs for iPhones and iPads, is expected to make the Mac
13    chips in factories in Asia – an arrangement much like Apple's use of Foxconn to
    assemble iPhones.

14                                *      *      *

15    [T]he long-term effects could still be serious for Intel.  The chipmaker's lofty profit
    margins have long been linked to its track record of delivering the most powerful
16    computing engines on the market, particularly for laptops and computer servers.
    But Intel has never done well selling chips for newer tech products like smartphones
17    and tablets.

18                                *      *      *

19    ***Intel has stumbled badly in that industrywide race to miniaturize.  Intel's latest***
    ***process for making chips, once expected as early as 2015, did not enter high-***
20    ***volume production until 2019***.   The delay aided Taiwan Semiconductor and
    Samsung Electronics, which produce chips designed by multiple companies.   The
21    competitors exploited Intel's lag to take a technology lead.

22        "***Intel has fallen behind by 12 months, maybe 18 months***," said Handel
    Jones, chief executive of International Business Strategies, which offers consulting
23    services to the chip industry.

24        ***Apple was troubled by the production stumble, according to three people***
    ***familiar with the situation***, who were not authorized to speak about confidential
25    dealings between the companies.

26    39.    On June 23, 2020, *Nikkei Asian Review* published an article titled "Apple to replace

27   Intel processors for Mac with in-house Chips."   The article reported on the news reports of the

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            - 13 -

split between Apple and Intel, noting that Apple would be introducing its new Mac by the end of

2020 with 7nm processing technology by TSMC:

> Apple is to replace Intel processors used in Mac computers with chips designed in-house, similar to those already powering iPhones, iPads and Apple Watches, in an important shift by the California-based tech giant.
>
> The decision is a win for Taiwan Semiconductor Manufacturing Co, the world's largest contract chipmaker, which will deepen its relationship with Apple by producing chips for the next generation of MacBooks and other Mac computers, sources told Nikkei Asian Review.
>
> *   *   *
>
> Sources told Nikkei **that Apple intended to introduce its new Mac by the end of this year using TSMC's 7 nanometer process technology**, before switching to 5nm technology next year.  TSMCs 5nm process is considered the world's most advanced chip manufacturing technology. . . .
>
> "**Apple will test this first with the 7nanometer process tech** . . . there are still a lot of tests and trials to be done between the new CPU and the Mac operating system," a source told Nikkei.

### INTEL'S TRUE FINANCIAL AND BUSINESS CONDITION
### BEGINS TO BE REVEALED

40.     On July 23, 2020, after the market closed, Intel issued a release announcing its

second quarter 2020 financial results.  The Company reported strong results for the quarter, beating

analysts' earnings expectations:

- Second-quarter revenue of $19.7 billion was up 20 percent year-over-year (YoY). Data-centric revenue grew 34 percent, accounting for 52 percent of total revenue; PC-centric revenue grew 7 percent YoY.

- Second-quarter GAAP earnings-per-share (EPS) was $1.19, up 29 percent YoY; non-GAAP EPS of $1.23 was up 16 percent.

- Year-to-date, generated $17.3 billion cash from operations and $10.6 billion of free cash flow and paid dividends of $2.8 billion.

- Accelerating 10nm product transition; 7nm product transition delayed versus prior expectations.

- Expecting full-year revenue of $75 billion; GAAP EPS of $4.53 and non-GAAP EPS of $4.85

41.     Despite the impressive revenue and earnings results, gross margins were lower than

expected, down 6.6% year over year, and the Company shocked investors by disclosing that it was

further accelerating the transition to 10nm products and, more importantly, that production and development of its 7nm chips was 12 months behind schedule.  Specifically, the release stated:

> **Intel is accelerating its transition to 10nm products this year with increasing volumes and strong demand for an expanding line up**.  This includes a growing portfolio of 10nm-based Intel Core processors with "Tiger Lake" launching soon, and the first 10nm-based server CPU "Ice Lake," which remains planned for the end of this year. . . .  **The company's 7nm-based CPU product timing is shifting approximately six months relative to prior expectations.  The primary driver is the yield of Intel's 7nm process, which based on recent data, is now trending approximately twelve months behind the company's internal target**.

42.     Following the July 23, 2020 release, the Company held a conference call for analysts and investors to discuss its second quarter 2020 results and the delay in 7nm development.  On the call, hosted by Swan and Davis, they discussed the 7nm technology delay, accelerated 10nm production, and the impact of both on Intel's expected financial performance and gross margins.  Lastly, defendants disclosed, to the surprise of the investment community, that Intel would consider third-party manufacturers, including TSMC, to build its 7nm products:

> [Swan:]   Turning to our 7-nanometer technology.   We are seeing an approximate 6-month shift in our 7-nanometer-based CPU product timing relative to prior expectations.  The primary driver is the yield of our 7-nanometer process, which, based on recent data, is now trending approximately 12 months behind our internal target.  We have identified a defect mode in our 7-nanometer process that resulted in yield degradation.  We've root caused the issue, and believe there are no fundamental roadblocks.  *[W]e have also invested in contingency plans to hedge against further schedule uncertainty*.  We're mitigating the impact of the process delay on our product schedules by leveraging improvements in design methodology such as die disaggregation and advanced packaging.

> *         *         *

> Ponte Vecchio [the Company's 7nm product], will now be released in late 2021 or early 2022, *utilizing external and internal process technologies*, combined with our world-leading packaging technologies.   We now expect to see initial production shipments of our first Intel-based 7-nanometer product, a client CPU, in late '22 or early '23.

> . . . We will continue to invest in our future process technology road map, but we will be pragmatic and objective in deploying the process technology that delivers the most predictability and performance for our customers, *whether that be on our process, external foundry process, or a combination of both*.

> *         *         *

> [Davis:]  Revenue came in at $19.7 billion, up 20% year-over-year and $1.2 billion higher than guide. . . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                     - 15 -

1    ***Gross margin for the quarter was 55%***, slightly below expectations, on
2    higher product costs from faster uptake of our 5G ASIC products, which are margin
     dilutive relative to the company average, and also continued acceleration of 10-
3    nanometer products overall, partially offset by a shift of costs from cost of sales to
     R&D related to 7-nanometer product timing.

4         43.    Suspicious of the Company's shift to the aggressive acceleration of its 10nm

5    products, one analyst challenged Swan and Davis to explain whether the acceleration was actually

6    due to strong 10nm yields or whether the Company was really trying to offset the 7nm delays and

7    why it was having an outsized impact on margins:

8         [Analyst:]  I want to ask about the acceleration in 10-nanometer.  ***Is this
          really because yields are getting better and there's higher demand or because
9         you're trying to offset the 7-nanometer delay?  Because it's hitting the margins
          big time***, which doesn't really tie in my head to, like, yields getting hugely better
10        versus where you thought they were going to be in January.  So how do I think
          about the drivers of that 7-nanometer acceleration in light of the 7 – or 10-
11        nanometer acceleration in light of the 7-nanometer delay given what it's doing to
          the margins?
12
          . . . [Davis:]  ***Maybe I'll just cover it in general on the margin picture for
13        the year because it's clearly – it's having an impact there***.  The acceleration is
          really definitely tied to the fact that we're growing faster than we expected in 2020.
14        And we're – part of that growth is a higher mix on the PC side and, I would say, on
          the comms and 5G ASIC side, higher demand for products that are on 10-nanometer
15        than we had forecasted for the year.  So it's why you're seeing a little less flow-
          through on revenue than we would have expected for the year.  It's a positive
16        growth story in that, again, we're seeing customers attracted to the 10-nanometer
          products.
17
          [Analyst:]  But wait a minute, if I look at your annual guidance now versus
18        where it was in the beginning of the year, it's higher, but it's actually lower in the
          second half versus what you had implied in – when you first gave the annual
19        guidance 6 months ago.  How does that imply that demand is higher versus where
          you were now given you've actually lowered the second half?
20
          [Davis:]  It's the demand for 10-nanometer products within the mix of our
21        overall revenue . . . .

22        44.    Analysts following the Company were shocked by the disclosures.  For example,

23   on July 23, 2020, Credit Suisse issued a report discussing the 7nm delay and pointing to the

24   resignation of Keller as potentially causing a further increase in competitive pressure:

25        ***Faster 10nm ramp CY20 GM guided to 58% from 59%***, (2) higher interest
          expense, (3) higher tax-rate – the latter two representing 15 cents combined.  ***While
26        [Intel']s results were NOT clean on the surface they would have been very
          defensible***: (1) While 2H Rev implies significant y/y deceleration especially in
27        DCG – 1H 43% y/y increase to 2H 8% y/y decline – it's consistent with
          management narrative of 1H strength and penchant to guide conservatively –
28        average upside to last 5Qs >$1 bb, and (2) Lower profitability NT is a function of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 16 -

ramping 10nm 20% faster than original expectations, which is positive. ***Unfortunately, along with results, [Intel] announced a 6 month delay in 7nm product timing due to yields which are ~12 months behind expectations – which implies 7nm GPU in late 2021/early 2022***, Client CPU in late 2022/early 2023 and Data Center CPU in 1H2023.  In addition, [Intel] spoke much more openly about outsourcing leading edge manufacturing (7nm GPU yes, 7nm CPU undecided). . . . [D]espite the ~2-3 year delay in 10nm – ***the execution shortfall on 7nm on the heels of the Jim Keller resignation, will re-ignite concerns on competitive position which will be difficult to refute and is a risk – the easy defensible narrative is [Intel]'s results are bullish for AMD***.

45.    On July 23, 2020, Cowen also issued a report, titled "Yes Its [sic] That Bad; with TSMC Humming Along, 7nm Couldn't Afford to Be Pushed," which stated, in part:

Intel's 2Q beat was completely overshadowed by a 6-month 7nm CPU pushout on a 12-month manufacturing delay.  With this timeline and recent technical management shakeup, we struggle to see how Intel stifles share loss in its core markets over the next several years, making revenue/EPS growth an uphill battle. Like in-sourcing, out-sourcing is far from zero risk. Market Perform, PT down to $55.

**With 7nm Pushed And The Roadmap In Flux, We Struggle To See How Intel Fights TSMC-Enabled Competitors; AMD's Share Gains Will Take Time, But Now An Open-Ended Thesis**

Roadmap uncertainty on 7nm (both timing and in/out-sourcing manufacturing strategy) will leave Intel's customers and investors frustrated and simultaneously ensure that the company cannot catch TSMC-enabled competitors' (namely AMD and NVIDIA) silicon process leadership in any bounded timeframe as it stands now. ***Management floated the idea of outsourcing core CPU silicon as a "contingency plan," a strategy many long-time Intel followers previously viewed as unthinkable***, given the irreparable harm to Intel's long-term Moore's Law differentiation vector.

By the time Intel ramps 7nm client/server silicon under its current timeline in 2H22/2023, AMD will likely be a mix of 3nm/5nm products, options available to all other Intel merchant processing competitors and to cloud SPs with their own insourcing ambitions.

46.    On July 24, 2020, Credit Suisse issued a report, titled "BitbyBit: Intel Q2 read: 7nm delays and lower capex," which remarked on the significance of the disclosure:

- . . . ***While*** Intel reported better sales than expected (Q2: $19.7bn vs. cons at $18.5bn and Q3 guide: $18.2bn vs. cons at $17.9bn), GMs were lower (Q2: 54.8% vs. cons at 55.9% and Q3 guide: 57% vs. cons at 58%) and ***headlines were grabbed by the announcement that 7nm chip launches will be delayed by 6 months as the company is running 12 months behind its internal target due to manufacturing defect leading to yield issues***. . . .

- ***Intel 7nm delayed by 6 months and lower capex plans. Intel now expects to launch its first 7nm chips for GPU in late 2021/early 2022***, Client CPU in late 2022/early 2023 and Datacenter CPU in 1H23 – all of which are 6 months behind the target announced during 2019.  However, given the

challenges and multiple delays it faced in 14nm to 10nm transition over the last 2-3 years, *it remains unclear whether 7nm will be back on track after this initial delay or may lead to further roadblocks.  Further, Intel also lowered its capex guidance to $15bn (-7% yoy) for 2020 due to plans for a bit higher spend on 10nm and lower spend on 7nm (from $17bn announced in Jan this year, although withdrawn in* Apr due to COVID-19).  It has spent $6.7bn of capex in 1H implying another $8.3bn to be spent in 2H20.

47.    As a result of these disclosures, the Company's share price declined $9.81 per share, or 16%, from a close of $60.40 per share on July 23, 2020 to a close of $50.59 per share on July 24, 2020, on more than 182 million shares traded.

48.    Then on July 27, 2020, the Company announced the departure of Renduchintala, the Company's Chief Engineering Officer, who the Company had previously assured investors would continue to lead a "vastly experienced" team of engineers after the departure of Keller (*see* ¶35, *supra*):

**Intel Makes Changes to Technology Organization**

**New Leaders for Key Intel Technology Organizations will Report Directly to CEO Bob Swan; Murthy Renduchintala to Depart**

. . . Today, Intel CEO Bob Swan announced changes to the company's technology organization and executive team to accelerate product leadership and improve focus and accountability in process technology execution.  Effective immediately, the Technology, Systems Architecture and Client Group (TSCG) will be separated into . . . teams, whose leaders will report directly to the CEO.

*       *       *

As a result of these changes, Murthy Renduchintala will leave Intel on Aug. 3, 2020.

49.    The same day, July 27, 2020, *The Verge* reported on this news and its connection to the failing development of the 7nm processor:

**Intel's hardware chief is leaving the company**

*Dr. Venkata (Murthy) Renduchintala's last day will be August 3rd*

The executive in charge of almost all of Intel's hardware, chief engineering officer Dr. Venkata (Murthy) Renduchintala, is leaving the company on August 3rd, Intel announced on Monday.

*His departure comes on the heels of Intel's announcement that its next-gen 7nm chips are delayed until at least 2022*, and after years of delays for the company's 10nm processors as well, which bottlenecked advancements for much

of the laptop industry. Intel did not cite a specific reason for Renduchintala's departure.

50. Following the disclosure of Renduchintala's abrupt departure, Intel's stock price declined from a close of $50.59 per share on July 24, 2020, to a close of $49.57 per share on July 27, 2020, on 107 million shares traded.

## LOSS CAUSATION/ECONOMIC LOSS

51. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Intel securities and operated as a fraud or deceit on Class Period purchasers of Intel securities. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the prices of Intel securities fell precipitously, as the prior artificial inflation came out of the prices. As a result of their purchases of Intel securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Intel publicly traded securities during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants' and their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, and the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

53. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intel shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of Intel common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Intel or its transfer agent and may be

1   notified of the pendency of this action by mail, using the form of notice similar to that customarily

2   used in securities class actions.

3        54.    Plaintiff's claims are typical of the claims of the members of the Class, as all

4   members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

5   law as complained of herein.

6        55.    Plaintiff will fairly and adequately protect the interests of the members of the Class

7   and has retained counsel competent and experienced in class and securities litigation.

8        56.    Common questions of law and fact exist as to all members of the Class and

9   predominate over any questions solely affecting individual members of the Class.  Among the

10  questions of law and fact common to the Class are:

11          (a)    whether the federal securities laws were violated by defendants' acts as

12  alleged herein;

13          (b)    whether statements made by defendants to the investing public during the

14  Class Period omitted and/or misrepresented material facts about the business, operations, and

15  prospects of Intel; and

16          (c)    to what extent the members of the Class have sustained damages and the

17  proper measure of damages.

18       57.    A class action is superior to all other available methods for the fair and efficient

19  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

20  damages suffered by individual Class members may be relatively small, the expense and burden

21  of individual litigation make it impossible for members of the Class to individually redress the

22  wrongs done to them.  There will be no difficulty in the management of this action as a class action.

23        **APPLICABILITY OF FRAUD-ON-THE-MARKET PRESUMPTION**

24       58.    The markets for Intel's securities were open, well-developed and efficient at all

25  relevant times.  As a result of the materially false and/or misleading statements and/or failures to

26  disclose, Intel securities traded at artificially inflated prices during the Class Period.  On June 5,

27  2020, the Company's stock closed at a Class Period high of $64.34 per share.  Plaintiff and other

28  members of the Class purchased or otherwise acquired the Company's securities relying upon the

1   integrity of the market prices of Intel securities and market information relating to Intel, and have

2   been damaged thereby.

3       59.     During the Class Period, the artificial inflation in the prices of Intel securities was

4   caused by the material misrepresentations and/or omissions particularized in this complaint, which

5   caused the damages sustained by plaintiff and other members of the Class.  As described herein,

6   during the Class Period, defendants made or caused to be made a series of materially false and/or

7   misleading statements about Intel's business, prospects, and operations.   These material

8   misstatements and/or omissions created an unrealistically positive assessment of Intel and its

9   business, operations, and prospects, thus causing the prices of the Company's securities to be

10  artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the

11  Company shares.  Defendants' materially false and/or misleading statements during the Class

12  Period resulted in plaintiff and other members of the Class purchasing Intel securities at such

13  artificially inflated prices, and each of them has been damaged as a result.

14      60.     At all relevant times, the market for Intel securities was an efficient market for the

15  following reasons, among others:

16          (a)     Intel stock met the requirements for listing and was listed and actively

17  traded on the NASDAQ, a highly efficient and automated market;

18          (b)     As a regulated issuer, Intel filed periodic public reports with the SEC and/or

19  the NASDAQ;

20          (c)     Intel regularly communicated with public investors via established market

21  communication mechanisms, including through the regular dissemination of press releases on

22  national circuits of major newswire services and through other wide-ranging public disclosures,

23  such as communications with the financial press and other similar reporting services; and/or

24          (d)     Intel was followed by securities analysts employed by brokerage firms who

25  wrote reports about the Company, and these reports were distributed to the sales force and certain

26  customers of their respective brokerage firms.  Each of these reports was publicly available and

27  entered the public marketplace.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                              - 21

1    61.    As a result of the foregoing, the market for Intel securities promptly digested

2    current information regarding Intel from all publicly available sources and reflected such

3    information in Intel's share price.  Under these circumstances, all purchasers of Intel securities

4    during the Class Period suffered similar injury through their purchase of Intel securities at

5    artificially inflated prices and a presumption of reliance applies.

6    62.    A Class-wide presumption of reliance is also appropriate in this action under the

7    Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

8    the Class's claims are, in large part, grounded on defendants' material misstatements and/or

9    omissions.   Because this action involves defendants' failure to disclose material adverse

10   information regarding the Company's business operations and financial prospects – information

11   that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to

12   recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

13   investor might have considered them important in making investment decisions.   Given the

14   importance of the material misstatements and omissions set forth above, that requirement is

15   satisfied here.

16                                     **COUNT I**

17                  **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
                                   **Against All Defendants**
18
19   63.    Plaintiff incorporates herein each and every allegation contained above.

20   64.    During the Class Period, defendants engaged in a scheme and course of conduct

21   that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

22   including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other

23   members of the Class to purchase Intel securities at artificially inflated prices.  In furtherance of

24   this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions

25   set forth herein.

26   65.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made

27   untrue statements of material fact and/or omitted to state material facts necessary to make the

28   statements made not misleading; and (iii) engaged in acts, practices, and a course of business that

1  operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

2  maintain artificially high market prices for Intel's securities in violation of §10(b) of the 1934 Act

3  and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal

4  conduct charged herein or as controlling persons as alleged below.

5        66.    Defendants, individually and together, directly and indirectly, by the use, means or

6  instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

7  continuous course of conduct to conceal adverse material information about Intel's financial well-

8  being and prospects, as specified herein.

9        67.    Defendants employed devices, schemes and artifices to defraud, while in

10  possession of material adverse non-public information and engaged in acts, practices, and a course

11  of conduct as alleged herein in an effort to assure investors of Intel's value and performance and

12  continued substantial growth, which included the making of, or the participation in the making of,

13  untrue statements of material fact and/or omitting to state material facts necessary in order to make

14  the statements made about Intel and its business operations and future prospects in light of the

15  circumstances under which they were made, not misleading, as set forth more particularly herein,

16  and engaged in transactions, practices and a course of business that operated as a fraud and deceit

17  upon the purchasers of the Company's securities during the Class Period.

18        68.    Each of the Individual Defendants' primary liability and controlling person liability

19  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

20  directors at the Company during the Class Period and members of the Company's management

21  team or had control thereof; (ii) each of the Individual Defendants, by virtue of their

22  responsibilities and activities as a senior officer and/or director of the Company, was privy to and

23  participated in the creation, development and reporting of the Company's internal budgets, plans,

24  projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal

25  contact and familiarity with the other defendants and was advised of, and had access to, other

26  members of the Company's management team, internal reports and other data and information

27  about the Company's finances, operations, and sales at all relevant times; and (iv) each of these

28

1  defendants was aware of the Company's dissemination of information to the investing public,

2  which they knew and/or recklessly disregarded was materially false and misleading.

3        69.    Defendants had actual knowledge of the misrepresentations and/or omissions of

4  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

5  ascertain and to disclose such facts, even though such facts were available to them.  Such

6  defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

7  for the purpose and effect of concealing Intel's financial well-being and prospects from the

8  investing public and supporting the artificially inflated price of its securities.  As demonstrated by

9  defendants' overstatements and/or misstatements of the Company's business, operations, financial

10 well-being, and prospects throughout the Class Period, defendants, if they did not have actual

11 knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain

12 such knowledge by deliberately refraining from taking those steps necessary to discover whether

13 those statements were false or misleading.

14       70.    As a result of the dissemination of the materially false and/or misleading

15 information and/or failure to disclose material facts, as set forth above, the market prices of Intel

16 securities were artificially inflated during the Class Period.  In ignorance of the fact that the market

17 prices of the Company's securities were artificially inflated, and relying directly or indirectly on

18 the false and misleading statements made by defendants, or upon the integrity of the markets in

19 which the securities trade, and/or in the absence of material adverse information that was known

20 to or recklessly disregarded by defendants, but not disclosed in public statements by defendants

21 during the Class Period, plaintiff and the other members of the Class acquired Intel securities

22 during the Class Period at artificially high prices and were damaged thereby.

23       71.    At the time of said misrepresentations and/or omissions, plaintiff and other

24 members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff and

25 the other members of the Class and the marketplace known the truth regarding the problems that

26 Intel was experiencing, which were not disclosed by defendants, plaintiff and other members of

27 the Class would not have purchased their Intel securities, or, if they had purchased such securities

28 during the Class Period, they would not have done so at the artificially inflated prices they paid.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          - 24 -

72.    By virtue of the foregoing, defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

73.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.    The Individual Defendants acted as controlling persons of Intel within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content  and dissemination of the various statements plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.    As set forth above, Intel and Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.  As a

1    direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the

2    Class suffered damages in connection with their purchases of the Company's securities during the

3    Class Period.

**PRAYER FOR RELIEF**

5        WHEREFORE, plaintiff prays for relief and judgment, as follows:

6        A.      Determining that this action is a proper class action, designating plaintiff as Lead

7    Plaintiff, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of

8    Civil Procedure and plaintiff's counsel as Lead Counsel;

9        B.      Awarding compensatory damages in favor of plaintiff and the other Class members

10    against all defendants, jointly and severally, for all damages sustained as a result of defendants'

11    wrongdoing, in an amount to be proven at trial, including interest thereon;

12        C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in

13    this action, including counsel fees and expert fees; and

14        D.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

16        Plaintiff hereby demands a trial by jury.

17    DATED: August 17, 2020            ROBBINS GELLER RUDMAN
                                         & DOWD LLP

18                                       SHAWN A. WILLIAMS

20                                    *s/ Shawn A. Williams*
                                     SHAWN A. WILLIAMS

22                              Post Montgomery Center
                             One Montgomery Street, Suite 1800

23                              San Francisco, CA 94104
                             Telephone: 415/288-4545

24                              415/288-4534 (fax)
                             shawnw@rgrdaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DANIELLE S. MYERS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
danim@rgrdlaw.com

Attorneys for Plaintiff

DocuSign Envelope ID: B77B98B2-31EA-4DCE-AF89-28B216E27F33

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Linda Matheson, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 6/11/20 | 600 | $61.61 |
|  |  |  |
|  |  |  |

**Sales:**

| N/A |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: B77B98B2-31EA-4DCE-AF89-28B216E27F33

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th  day of August, 2020.

DocuSigned by:

*Linda Matheson*

1C0F27E6EES41C...

Linda Matheson